1  Winston Y. Chan (SBN 214884)
   Hannah Erin Stone (SBN 339612)
2  **GIBSON, DUNN & CRUTCHER LLP**
   One Embarcadero Center, Suite 2600
3  San Francisco, CA 94111
   Telephone: (415) 393-8362
4  Facsimile: (415) 393-8306
   Email: wchan@gibsondunn.com
5
   W. Douglas Sprague (SBN 202121)
6  **COVINGTON & BURLING LLP**
   415 Mission Street, Suite 5400
7  San Francisco, California 94105
   Telephone: (415) 591-6000
8  Facsimile: (415) 591-6091
   Email: dsprague@cov.com
9
   Erik Babcock (SBN 172517)
10 **LAW OFFICES OF ERIK BABCOCK**
   420 3rd Street, Suite 250
11 Oakland, California 94607
   Telephone: (510) 452-8400
12 Facsimile: (510) 201-2084
   Email: erik@babcocklawoffice.com
13

14 Attorneys for Defendant Andy Hung Duong

15

16                 UNITED STATES DISTRICT COURT

17               NORTHERN DISTRICT OF CALIFORNIA

18                     OAKLAND DIVISION

| | |
|---|---|
| 19  UNITED STATES OF AMERICA, | Case No. 4:25-CR-00003-YGR |
| 20  Plaintiff, | **DEFENDANT ANDY DUONG'S NOTICE OF JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR *FRANKS* HEARING; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| 21  v. | |
| 22  SHENG THAO, ANDRE JONES, DAVID TRUNG DUONG, and ANDY HUNG DUONG, | |
| 23  Defendants. | Hearing Date:  February 19, 2026 |
| 24  | Hearing Time:  9:00 a.m. |
| 25  | Judge:  Hon. Yvonne Gonzalez Rogers |
| | Courtroom:  1, 4th Floor |

26

27

28

# TABLE OF CONTENTS

**Page**

I.     **INTRODUCTION** ....................................................................................................................1

II.    **FACTUAL BACKGROUND** ..............................................................................................2

    A.     CC1's Public and Known History of Fraud and Deceit....................................2

    B.     Events Leading Up to the June 2024 Searches ................................................2

    C.     June 14, 2024 Search Warrant Affidavit.........................................................3

    D.     June 20, 2024 Rollover Warrant Affidavit......................................................7

    E.     Other Search Warrants ....................................................................................8

III.   **LEGAL STANDARD** ........................................................................................................8

IV.   **ARGUMENT** ....................................................................................................................9

    A.     The June 2024 Affidavits Lack Probable Cause ...........................................10

        1.     The June 2024 Affidavits Knowingly and Recklessly Omitted Evidence........10

        2.     The Omissions Undermine Probable Cause....................................................12

        3.     Probable Cause Did Not Exist to Search Andy Duong's Home and Car .........19

    B.     Other Warrants Obtained Are Impermissibly Overbroad .............................21

        1.     The March 22, 2024 Cell Phone Warrant Is Partially Overbroad....................22

        2.     The February and May 2024 Warrants Are Partially Overbroad.....................22

V.     **CONCLUSION**................................................................................................................**24**

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bravo v. City of Santa Maria,*
   665 F.3d 1076 (9th Cir. 2011)..................................................................................11

*Ctr. Art Galleries-Hawaii, Inc. v. United States,*
   875 F.2d 747 (9th Cir. 1989)....................................................................................24

*Chism v. Washington State,*
   661 F.3d 380 (9th Cir. 2011)....................................................................................11

*Commonwealth of Northern Mariana Islands v. Bowei,*
   243 F.3d 1109 (9th Cir. 2001)..................................................................................13

*Donahoe v. Arpaio,*
   986 F. Supp. 2d 1091 (D. Ariz. 2013)......................................................................17

*Franks v. Delaware,*
   438 U.S. 154 (1978).....................................................................................9, 10, 12

*Georgia v. Randolph,*
   547 U.S. 103 (2006)................................................................................................19

*Illinois v. Gates,*
   462 U.S. 213 (1983)..................................................................................................8

*Jones v. United States,*
   362 U.S. 257 (1960)..................................................................................................9

*In re Search of Google Accts. identified in Attachment A,*
   92 F. Supp. 3d 944 (D. Alaska 2015).......................................................................23

*United States v. Barajas,*
   517 F. Supp. 3d 1008 (N.D. Cal. 2021) ...................................................................21

*United States v. Bennett,*
   219 F.3d 1117 (9th Cir. 2000)..................................................................................13

*United States v. Cervantes,*
   703 F.3d 1135 (9th Cir. 2012)..................................................................................17

*United States v. Davis,*
   617 F.2d 677 (D.C. Cir. 1979)..................................................................................11

*United States v. Davis,*
   932 F.2d 752 (9th Cir. 1991)....................................................................................24

*United States v. Esparza,*
   546 F.2d 841 (9th Cir. 1976)....................................................................................13

ANDY DUONG'S JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR *FRANKS* HEARING
CASE NO. 4:25-CR-00003-YGR

*United States v. Hall,*
   113 F.3d 157 (9th Cir. 1997)..........................................................13

*United States v. Leon,*
   468 U.S. 897 (1984)...................................................9, 19, 21, 24

*United States v. Lofstead,*
   574 F. Supp. 3d 831 (D. Nev. 2021).........................................24

*United States v. Loloee,*
   2025 WL 671107 (E.D. Cal. Mar. 3, 2025) .............................13

*United States v. Ngumezi,*
   980 F.3d 1285 (9th Cir. 2020)...........................................9, 20

*United States v. Patterson,*
276 F.Supp.3d 994 (S.D. Cal. 2017) ..........................................24

*United States v. Perkins,*
   850 F.3d 1109 (9th Cir. 2017)....................................................10

*United States v. Pitts,*
   6 F.3d 1366 (9th Cir. 1993)........................................................19

*United States v. Pulliam,*
   405 F.3d 782 (9th Cir. 2005)......................................................20

*United States v. Ramos,*
   923 F.2d 1346 (9th Cir. 1991)....................................................19

*United States v. SDI Future Health, Inc.,*
   568 F.3d 684 (9th Cir. 2009)..........................................22, 23, 24

*United States v. Spilotro,*
   800 F.2d 959 (9th Cir. 1986)......................................................23

*United States v. Stanert,*
   762 F.2d 775 (9th Cir. 1985)................................................9, 13

*United States v. Thomas,*
   211 F.3d 1186 (9th Cir. 2000)....................................................17

*United States v. Underwood,*
   725 F.3d 1076 (9th Cir. 2013).......................................................9

*United States v. Weber,*
   923 F.2d 1338 (9th Cir. 1990)....................................................17

*United States v. Ziegler,*
   474 F.3d 1184 (9th Cir. 2007).....................................................22

**Statutes**

18 U.S.C. § 666(a)(2)....................................................................16

ANDY DUONG'S JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR *FRANKS* HEARING
CASE NO. 4:25-CR-00003-YGR

## Constitutional Provisions

U.S. Const. amend. IV ................................................................................................................8

**PLEASE TAKE NOTICE** that on February 19, 2026, at 9:00 a.m., before the Honorable Yvonne Gonzalez Rogers, that Defendant Andy Duong will and hereby does join in Defendant David Duong's motion for suppression and a *Franks* hearing ("D. Duong's Motion"), and also submits his own additional such motion, and will and hereby does move the Court for an order (1) granting a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 165 (1978), regarding material misrepresentations and/or omissions in the search warrant affidavits sworn on June 14, 2024 before Magistrate Judge Kandis Westmore, and on June 20, 2024 before Magistrate Judge Donna M. Ryu; (2) suppressing the evidence seized from his residence and vehicle, and from the room of D. Duong's house that the government alleges is attributable to A. Duong, on June 20, 2024; (3) suppressing evidence other than location data seized pursuant to the search warrant signed on March 22, 2024 by Magistrate Judge Donna M. Ryu; (4) suppressing evidence regarding interactions or communications between "any" state or local government or officials, other than those related to the limited set of public officials enumerated in the accompanying affidavits, seized pursuant to the search warrants signed on February 26, 2024 by Magistrate Judge Kandis Westmore, and on May 7, 2024 by Magistrate Judge Donna M. Ryu; and (5) suppressing evidence pre-dating December 1, 2021, seized pursuant to the search warrant signed on February 26, 2024 by Magistrate Judge Kandis Westmore and the search warrant signed on May 7, 2024 by Magistrate Judge Donna M. Ryu. This motion is based on the instant

notice, the attached memorandum of points and authorities, the concurrently filed declaration of Winston Y. Chan, the files and records in this matter, and such evidence and argument as may be presented at the hearing.

DATED: December 4, 2025                    Respectfully submitted,


By: */s/ Winston Y. Chan*
    Winston Y. Chan
    Hannah Erin Stone
    GIBSON, DUNN & CRUTCHER LLP

    W. Douglas Sprague
    COVINGTON & BURLING LLP

    Erik Babcock
    LAW OFFICES OF ERIK BABCOCK

    Attorneys for Defendant Andy Hung Duong

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Three decades' worth of public records, press stories, past federal and state criminal investigations, and inconsistent statements to law enforcement collectively show what should have been obvious to investigators in this case: the government's key witness ("CC1") lacks all credibility and CC1's word counts for nothing. Yet a pair of warrant applications signed and executed in June 2024 inexplicably omit this robust history, despite predominantly relying upon CC1's mere say-so for probable cause to search the Defendants' homes, vehicles, and persons.[1] The warrant applications rely on CC1's account to allege the existence of a bribery scheme. But properly stripped of CC1's self-serving spin, these allegations lack support and cannot supply probable cause for the searches. The critical omissions as to the credibility of CC1, themself the original target of the government's investigation, render the warrants defective because they deprived the issuing judges of the full context that the Fourth Amendment demands to evaluate these allegations. A. Duong respectfully joins in D. Duong's Motion and files the instant motion seeking an order requiring the government to produce its affiants, FBI Special Agents Duncan Haunold and Ethan Quinn, at a *Franks* hearing so defense counsel can question them about the material omissions and thereby demonstrate that all materials seized from A. Duong pursuant to these affidavits should be suppressed.

The June 2024 affidavits suffer from another critical defect that is also the subject of D. Duong's Motion: they fail to provide any logical or factual link between A. Duong's home and vehicle and any alleged evidence of the listed offense. All evidence seized from these locations pursuant to these warrants should also be suppressed for the independent reason that they lack probable cause to search the enumerated locations.

Certain evidence seized from other warrants in this case also requires suppression. The February, March, and May 2024 warrants to search A. Duong's cell phone, iCloud, and Microsoft

---

[1] The June 14, 2024 affidavit authorized the search of David Doung, Andy Duoug, Sheng Thao, Andre Jones, their respective residences and automobiles, the offices of California Waste Solutions ("CWS"), the Vietnamese American Business Association ("VABA"), and Evolutionary Homes, LLC ("EH"), as described in the warrant affidavit. *See* Dkt. 120-1, Attach. A-1–A-16. The June 20, 2024 "rollover" affidavit authorized the seizure of certain evidence from the Duongs' homes discovered during the execution of the original warrant. *See* Dkt. 120-2, Attach. B-1–B-2.

accounts were all overbroad. As explained in D. Duong's Motion, the March 2024 affidavit asserted probable cause to seek historical location data from A. Duong's cell phone provider, but the warrant permitted additional types of data never mentioned in the affidavit to be seized. The February and May 2024 warrants similarly steamroll over topical and temporal constraints established in their supporting affidavits. The Court should suppress all of this out-of-scope evidence.

## II.    FACTUAL BACKGROUND

### A.    CC1's Public and Known History of Fraud and Deceit

CC1 has a pervasive and well-known pattern of deception, as D. Duong's Motion describes in detail. Dkt. 119 at 12–14 (describing CC1's publicly documented history of fraud and threats and lies to former business partners, debt collection principals (including the City of Oakland), a landlord, and parties to a real estate transaction; also describing CC1's bankruptcy, forced surrender of their real estate license, and being investigated as part of a federal money laundering probe). Nevertheless, the challenged search warrants left out this multitude of readily available red flags as to CC1's credibility— even though CC1's statements and characterizations of events supplied the primary basis for the warrants' statement of probable cause. The affidavits further exclude that CC1 repeatedly contradicted their own accounts of two pernicious accusations: that A. Duong allegedly was involved in attacks on CC1 on May 3, 2024 and June 9, 2024.

### B.    Events Leading Up to the June 2024 Searches

The origin of the present case is yet another CC1 fraud scheme gone wrong. The FBI obtained warrants for CC1's iCloud accounts in July 2023 and February 2024 after learning of CC1's fraud on the U.S. Postal Service and the owner of a local printing business in the lead-up to the 2022 Oakland mayoral election. Dkt. 120-1 ¶¶ 32–34, 111. In October 2022, CC1 wrote $52,563.20 in checks to cover the postage fees for mailers attacking mayoral candidate Sheng Thao's political opponents— from an account with a balance of only a few hundred dollars. *Id.* ¶¶ 33, 72. CC1 then disappeared and left the print shop owner and USPS holding the bag. *Id.* ¶ 33. In early 2024, the Alameda County District Attorney charged CC1 with a felony count of passing bad checks. *Id.*

During the investigation into CC1, agents located information on CC1's iCloud account that the agents believed implicated CC1 and the Defendants in the alleged bribery scheme now charged in

2

the indictment. *Id.* ¶ 26. Agents obtained a series of warrants for A. Duong's (and his co-defendants') cell phone data in February, March, and May 2024. As fraud allegations and open investigations mounted against CC1, they began speaking with Oakland police in May 2024 and gave a salacious, contradictory account of an alleged altercation with the Duongs earlier that month. *See infra* Section IV.A.1. FBI agents interviewed CC1 for the first time on June 6, 2024. Dkt. 120-1 ¶ 30. Based almost entirely on CC1's statements during that interview, the government obtained a warrant on June 14, 2024, to search the Defendants' homes, vehicles, and persons. Dkt. 120-1. Early in the morning on June 20, 2024, agents raided A. Duong's home.[2] That same day, the government applied for and received a rollover warrant to seize additional items discovered in the Duongs' homes. Dkt. 120-2.

### C. June 14, 2024 Search Warrant Affidavit

The affiant for the June 14, 2024 warrant was FBI Special Agent Duncan Haunold, who attended the June 6, 2024 interview with CC1 and was previously familiar with evidence from CC1's iCloud account. Dkt. 120-1 ¶¶ 3, 26 n.1, 30, 30 n.2. Agent Haunold's affidavit alleges there was probable cause to believe that A. Duong and others involved with EH conspired to and did bribe Thao by financing a negative mailer campaign and by directing financial payments to her partner in exchange for political favors, including Oakland's purchase of container homes from EH. *Id.* ¶ 24.

The affidavit's conclusions involving A. Duong chiefly rest on a combination of CC1's statements about various meetings and exchanges; CC1's interpretations of one-sided communications and CC1's own electronic notes; and the affiant's general "training and experience." *See* Dkt. 120-1. As D. Duong's Motion explains, the affidavit contains limited impeachment information about CC1 in a single footnote. Dkt. 119 at 7.

**October 7, 2022:** The affidavit alleges that CC1 and Thao met in person on October 7, 2022 to discuss the charged bribery scheme, per CC1's statements from their June 6, 2024 FBI interview. Dkt 120-1 ¶¶ 50–52. The affidavit does not allege that A. Duong was involved with this meeting or its planning, but it describes a text message from CC1 to A. Duong purportedly referencing, at various

---

[2] Agents seized evidence from A. Duong's home, including two cell phones. *See* Decl. of Winston Y. Chan in Supp. of Andy Hung Duong's Joinder and Additional Mot. to Suppress and for *Franks* Hr'g ("Chan Decl.") Ex. 1 at 1, 5–6.

points, this meeting, the purchase of container homes, and certain payments. *Id.* ¶¶ 53–54. The agent's conclusions about the meaning of and connection between these cryptic and disjointed exchanges derive from the explanation provided during CC1's June 6 interview about the communications and about CC1's own Apple Note created on September 30, 2022 (but last modified November 7, 2022). *Id.* ¶¶ 49, 55.

**October 11, 2022 fundraiser:** The affidavit next alleges that during an October 11, 2022 campaign fundraising event for Thao, she, CC1, and A. Duong excused themselves so they could privately discuss the alleged bribe. *Id.* ¶¶ 57, 131. The conclusions about the existence and contents of this meeting rely exclusively on CC1's telling. *Id.*

**Mid-October check to CC1:** The affidavit also claims that on October 17, 2022, CC1 deposited a check from CWS for $75,000, allegedly an illicit payment for the negative mailer campaign. *Id.* ¶ 65. The date of the check was September 29, 2022—over a week before CC1 allegedly broached a bribery scheme with Thao and nearly two weeks before CC1 allegedly solidified the deal on October 11, 2022. *Id.* Nevertheless, the affiant concludes that the check was provided to cover the cost of the negative mailers—because that's what CC1 said. *Id.* The affidavit describes mid-October texts between A. Duong and CC1 about invoices for $75,000 and $50,000 and tax forms, but CC1's statement is the only evidence cited for the conclusion that the September 29 check was connected to the negative mailer campaign, let alone to a bribe. *Id.* ¶¶ 65–70.

**November 18, 2022 messages:** The affidavit also concludes that text messages primarily sent from CC1 to A. Duong on November 18, 2022, reacting to local election results, reference the bribe CC1 claims to have arranged. *Id.* ¶¶ 74–77. All the text messages are sent from CC1 to A. Duong, except for A. Duong's bare-bones comments on election outcomes. *Id.* ¶¶ 74–76.

**December 14, 2022 and March 26, 2023 messages:** The affidavit describes messages, some of which go completely ignored, from CC1 to A. Duong on December 14, 2022 and March 26, 2023, about a loan to Andre Jones and concludes that the messages evidence a bribery scheme. *Id.* ¶¶ 64, 88–89. This conclusion rests on CC1's statements to the FBI claiming that the loan was an advance, which would need to be repaid if Jones failed to deliver on the purported deal. *Id.* ¶ 64.

**March 4, 2023 and March 7, 2023 messages:** The affidavit describes more ignored messages

4

from CC1 to A. Duong on March 4, 2023 and March 7, 2023, concerning a draft letter of intent from the City of Oakland to purchase housing units from EH. *Id.* ¶¶ 79–80. The affidavit cites CC1's statements to the FBI to conclude that CC1 drafted the letter in hopes that it would become official. *Id.* ¶ 79. Nothing in the affidavit alleges that A. Duong was involved with the draft letter.

**March 9, 2023 meeting:** The affidavit next describes a supposed meeting at the restaurant Skates on the Bay on March 9, 2023, where it alleges that the purported bribe was reaffirmed and more payments were promised to Jones and Thao. *Id.* ¶¶ 81–82. A. Duong's purported attendance at this meeting, along with the contents of the alleged meeting, rest entirely on CC1's statements to the FBI. *Id.* The affidavit references a pair of expenses on an Apple Note in CC1's phone, but neither expense report mentions A. Duong. *Id.* ¶ 81.

**March 16–17, 2023 messages:** The affidavit next describes unsolicited text messages from CC1 to A. Duong that it concludes evidence the bribe and the supposed additional payments that were agreed to at the Skates by the Bay meeting. *Id.* ¶¶ 83–85. The affidavit offers CC1's statements and the affiant's prior conclusions in support of this assertion. *Id.* ¶¶ 84–85.

**March 26, 2023 messages and CC1's Note:** As described in D. Duong's Motion, the affidavit turns to a convoluted stream of messages between CC1 and A. Duong, including messages allegedly expressing frustration with a supposedly surprise requirement to submit a formal funding proposal to the City of Oakland, along with commentary about communication etiquette, prior support of Thao, and Jones' motivations. *See* Dkt. 119 3–4; Dkt. 120-1 ¶¶ 86–88. It interprets these messages, along with other cursory responses sent by A. Duong to CC1 regarding the contents of an Apple Note CC1 claims outline the purported deal, to mean that A. Duong was affirming and ratifying the alleged scheme. Dkt. 120-1 ¶¶ 89–92. This interpretation, however, is supported only by the affiant's own training and experience, combined with statements from CC1 that reinforced the conclusion the affiant had already formed about what the Apple Note reflected. *Id.* ¶¶ 87–92.

**April 2023 messages:** The affidavit later draws conclusions as to an April 11, 2023 message from CC1 regarding draft consultant compensation terms and an April 18, 2023 message from D. Duong to CC1 about advancing funds to Jones contingent upon Jones sensibly signing a contract. Dkt. 120-1 ¶¶ 97–98, 102. But the affiant does not allege that A. Duong ever responded or was

5

otherwise involved beyond his mere presence in the threads where these messages were sent. *Id.* ¶¶ 98, 102.

**September 2023 message:** The affidavit cites a message from CC1 to A. Duong about a distrust CC1 had developed about the mayor and pushing for a meeting with A. Duong, D. Duong, and a third person. *Id.* ¶ 116. The affidavit omits that this erratic message came amid a slew of others from CC1 to A. Duong and that A. Duong never responded to CC1's comments about the mayor. Chan Decl. Ex. 2 at 2–3.

**May 3, 2024, incident:** The affidavit also describes an altercation that CC1 claimed CC1 had with the Duong family on May 3, 2024, that resulted in an alleged assault by individuals supposedly acting at the behest of the Duongs. Dkt. 120-1 ¶ 29. The affidavit's account of this alleged incident derives from CC1's statements to law enforcement over a series of interviews on May 5, May 14, and June 6, 2024, as well as from a May 9 letter CC1 wrote which the FBI obtained on May 15. *Id.* ¶¶ 29, 119–21, 126–27, 139–40. According to CC1: CC1 was locked out of the offices at 1211 Embarcadero by members of the Duong family; multiple people supposedly engaged by a Duong family member appeared, accosted CC1, and stole some of CC1's valuables; and someone contacted Thao, which is why, CC1 believed, the Oakland Police Department ("OPD") did not respond to the scene. *Id.* ¶¶ 119–21. As alleged in the affidavit, A. Duong's purported involvement comprised only two things: (i) being one of three people to lock CC1 out of the EH offices for failure to pay rent, and (ii) communicating on the phone with a Duong family member and OPD. *Id.* ¶¶ 119, 122–24. The first rests entirely on CC1's statements and the second is attributed to toll records showing calls between A. Duong and his family, and OPD phone numbers. *Id.* ¶¶ 119, 122–24.

**June 9, 2024 shooting at CC1's residence:** The incendiary allegations in the affidavit framing the shootout outside CC1's home as organized by the Duongs are well-documented in D. Duong's Motion. Dkt. 119 at 6–7. Crucially, the affidavit's theory of a targeted attack orchestrated by the Duongs, all for the fanciful purpose of scaring CC1 off from speaking to investigators, chiefly relies on CC1's account of the shooting. Dkt. 120-1 ¶ 144. The specific allegation that A. Duong was involved in the shooting rests on just two pieces of evidence: (1) toll records showing that around the time of the shooting A. Duong was in phone communication with an Asian man with an alleged violent

6

criminal history (*id.* ¶¶ 148–50), and (2) CC1's statement that the gunmen were a Black and an Asian man—which itself is contradicted on the face of the affidavit by (i) CC1's own admission that they were not certain of their own account since the shooters' facial features were obscured by hoodies; (ii) an independent witness's identification of the shooters as two Mexican men; and (iii) intel from a confidential human source that the shooter was a Hispanic man. *Id.* ¶¶ 146–47. CC1 has since publicly admitted CC1 fired first after they saw suspects in two cars breaking into CC1's SUV, confirming CC1 lied to the FBI prior to the June 2024 warrants, and that in truth the shooting was related, at most, to a random botched car theft. Chan Decl. Ex. 4 at 2–3.[3]

### D. June 20, 2024 Rollover Warrant Affidavit

On June 20, 2024, during the execution of the warrant supported by the June 14, 2024 affidavit, FBI Special Agent Quinn submitted another affidavit seeking a "rollover" warrant to seize certain newly listed physical items. Dkt. 120-2 ¶¶ 13–23, Attach. B1, B-2. The rollover search warrant affidavit incorporates the original June 14, 2024 affidavit by reference. *See id.* ¶ 2, Ex. A. It also supplements the statement of probable cause with six categories of evidence, some of which were discovered during the execution of the first set of search warrants on June 20, 2024 and were the subject of the rollover warrant itself: (i) ███████████████ █ ████████████████████████ ████████████████████████████ (ii) ██████████████████████████████ ████████████ (iii) ████████████████████████████████████████ ████████████████████████████████ (iv) ███████████ ████████████████████████████████████████████████ ███████████████████████ (v) additional information about the shooting at CC1's house, including that CC1 had given inconsistent statements about the type of Glock firearm they used to "defend" themself during the shooting and evidence that the shooter used a 9mm firearm; and (vi) May

---

[3] Ultimately, a Hispanic male matching the independent witnesses' descriptions of the shooter was arrested and charged earlier this year for the shooting. Chan Decl. Ex. 3. He has publicly admitted to being the gunman, explaining that while he was on his way home, he approached CC1's car, CC1 shot at him, and he fired back. Chan Decl. Ex. 4 at 2–3.

[4] ████████████████████████████████████████████████████ █████████████████████████████████████████████ .

2023 text messages from CC1 to a third party regarding CWS.  *Id.* ¶¶ 13–21, 23.

E.    **Other Search Warrants**

Prior to the June 2024 search warrants, the government obtained three other search warrants as to A. Duong.  On February 23, 2024, investigators submitted an affidavit in support of a search warrant application for information from Apple associated with A. Duong's Apple ID.  Chan Decl. Ex. 5.  On May 7, 2024, investigators submitted a nearly identical affidavit in support of a search warrant application for information from Microsoft associated with A. Duong's CWS email account.  Chan Decl. Ex. 6.  In relevant part, the Apple warrant authorizes the search and seizure of records from January 1, 2020 to February 23, 2024 (the date of its issue).  Chan Decl. Ex. 5, Attach. B at 5.  The Microsoft search warrant authorizes the search and seizure of documents from January 1, 2019 to May 7, 2024 (the date of its issue).  Chan Decl. Ex. 6, Attach. B at 4.  The February and May 2024 warrants also authorize the seizure of "[e]vidence, records, or communications related to any interactions between [CWS] (or any of its employees or representatives), and any state or local government body or government officials."  Chan Decl. Ex. 5, Attach. B at 6; Chan Decl. Ex. 6, Attachment B at 5.

On March 22, 2024, agents submitted an affidavit in support of a search warrant application for information about the location of cellular telephones believed to be linked to A. Duong to corroborate his attendance at certain in-person meetings.  Dkt. 120-3 ¶¶ 1, 88.  The warrant itself authorizes seizure of additional categories of information, including subscriber identities and addresses; billing and payment information; account start and service records; device and instrument identifiers; and complete connection/session records, including IP addresses, sector information, and timing advance data.  *Id.*, Attach. B-1–B-2.

III.   **LEGAL STANDARD**

As set forth in D. Duong's Motion, a search warrant may only be issued upon a showing of probable cause.  Dkt. 119 at 8, citing U.S. Const. amend. IV.  In evaluating whether a warrant is supported by probable cause, the reviewing magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213,

238 (1983). The reviewing magistrate must ensure that she has "a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). Evidence obtained in violation of the Fourth Amendment is generally subject to the exclusionary rule, which "requires courts to suppress any evidence obtained as a 'direct result of an illegal search or seizure,' as well as 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *United States v. Ngumezi*, 980 F.3d 1285, 1290 (9th Cir. 2020). Suppression is required "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," *United States v. Leon*, 468 U.S. 897, 923 (1984), or where the affidavit supporting the warrant was "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013) (quoting *Leon*, 468 U.S. at 922). Under this analysis, providing an affidavit with deliberate or reckless omissions that tend to mislead is equivalent to providing an affidavit with deliberately falsified information. *Id.*

Under *Franks v. Delaware*, 438 U.S. 154 (1978), when the defendant's motion to suppress "makes a substantial preliminary showing" that the affiant (1) included "a false statement knowingly and intentionally, or with reckless disregard for the truth" in the affidavit that was (2) material, i.e., "necessary to the finding of probable cause," the court must order a hearing on that motion. *Id.* at 155–56. This preliminary showing does not need to prove an actual *Franks* violation. *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985), *amended by*, 769 F. 2d 1410 (9th Cir. 1985). Once the defendant has made the preliminary showing, the court conducts an evidentiary *Franks* hearing to ultimately determine whether the defendant has established the two elements of a violation by a preponderance of the evidence. *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017). If so, the court must void the warrant and suppress all fruits of the search. *Id.*

## IV. ARGUMENT

The Court should suppress all evidence gathered pursuant to the June 2024 warrants because the government knowingly and recklessly omitted critical exculpatory and impeachment information relating to CC1. This information was material because, had the affidavits included it, the magistrate

9

judges never would have found probable cause to sign the warrants. At the very least, this satisfies the preliminary showing required for a *Franks* hearing. All evidence seized pursuant to the June 2024 warrants should also be suppressed because the affidavits do not support the inference that the evidence authorized to be seized would actually be located there. Certain evidence seized pursuant to the February, March, and May 2024 warrants should likewise be suppressed because they authorize searches beyond the scope of probable cause asserted in the supporting affidavits.

### A. The June 2024 Affidavits Lack Probable Cause

Evidence gathered pursuant to both June 2024 warrants should be suppressed because the applications for them knowingly and recklessly omitted (1) information about CC1's history of proven fraud that completely undermines CC1's general credibility, (2) CC1's inconsistent statements about the May 3, 2024 incident, and (3) forensic and eyewitness evidence directly refuting CC1's accusation that the Duongs were involved in the June 9, 2024 shooting. By omitting this information, the affiants misled the magistrate judges who signed the warrants into concluding that the applications were supported by probable cause. The omissions fatally undermine both affidavits' showing of probable cause for the searches.

Even if the June 2024 affidavits had included this impeachment information, they fail to establish probable cause to search A. Duong's home and vehicle because they supply no logical or factual link between these places and the existence of evidence for the alleged crime. And the specific items discovered on June 20, 2024 and cited in the rollover warrant affidavit cannot provide probable cause for their seizure from A. Duong's home and vehicle.

### 1. The June 2024 Affidavits Knowingly and Recklessly Omitted Evidence

The affiants omitted crucial information bearing on CC1's credibility, despite the affidavits' dependence on CC1's statements and obvious parallels between their history and behavior. All this information was either known by the affiants or public at the time the affidavits were submitted.

The first prong of the *Franks* analysis requires courts to determine whether the affidavit included "a false statement knowingly and intentionally, or with reckless disregard for the truth." *Franks*, 438 U.S. at 155. The omission of information or inclusion of misleading information in an affidavit is done knowingly when those misrepresentations were "all facts that were within [the

affiant's] personal knowledge." *Chism v. Washington State*, 661 F.3d 380, 388 (9th Cir. 2011). An affiant acts with reckless disregard for the truth when he "in fact entertained serious doubts as to the truth" of the affidavits or had "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979); *see Bravo v. City of Santa Maria*, 665 F.3d 1076, 1088 (9th Cir. 2011). Three key categories of information were knowingly or recklessly left out of the affidavits.

*First*, the June 2024 affidavits fail to disclose information regarding CC1's track record of fraud and deception. *See supra* Section II.A. Almost all the omitted information about CC1's past was publicly reported in the media or readily accessible in public records from at least 33 lawsuits against CC1, bankruptcy filings, and Department of Real Estate records. *See* Dkt. 119 at 12–14; Dkt. 120-6. Even if the affiants claim not to have had actual knowledge of this pertinent information at the time of the affidavits, it was reckless not to investigate and report this record to the magistrate judges given how much the affiants already knew about CC1's record. *See* Dkt. 119 at 7. All this known information should have raised "serious doubts" about the "accuracy of the information contained" in the affidavits, which relied mostly on CC1's statements. *Davis*, 617 F.2d at 694. Other non-public information about CC1's past was known to the affiants long before the June 2024 warrants but not reported in the affidavits, including that CC1 was the subject of a federal money laundering probe. Dkt. 120-15.

*Second*, the June 2024 affidavits fail to disclose nearly every major inconsistency across CC1's various statements in the aftermath of the May 3, 2024 incident at 1211 Embarcadero. The affidavits paint a one-sided picture of the incident from a selection of CC1's statements but withhold that CC1 gave OPD investigators contradictory accounts of at least three pivotal details of the altercation on May 3, 2024: (i) who beat CC1 up;[5] (ii) what they took;[6] and (iii) who called 9-1-1.[7] The affiants were

---

[5] Descriptions of nine black men and one Asian "ringleader" (Chan Decl. Ex. 13 at 18:54–19:30, 20:25–21:15, 23:11–23:43), versus a group of "black people," "Asian people," and "people who were white or something else" (Chan Decl. Ex. 12 at 21:12–21:23), versus "the Duongs" themselves (Chan Decl. Ex. 14 at 2).

[6] Various wearable accessories, two phones, and $1,000 cash (Chan Decl. Ex. 13 at 22:31–22:50, 29:33–31:45), versus the aforementioned items plus CC1's car and house keys (*id.* at 39:25–39:51).

[7] D. Duong called 9-1-1 (Chan Decl. Ex. 13 at 48:16–48:34), versus A. Duong called 9-1-1 (*id.* at 48:50–49:08).

clearly aware of these contradictions because at least one attended the June 6, 2024 interview with CC1 and the affidavits reference portions of the OPD interviews. Dkt. 120-1 ¶¶ 119–21, 127. The affidavits provided to the magistrate judges misleadingly presented CC1's statements about the May 3 incident as coherent and consistent when they clearly were not.

*Third*, as described in D. Duong's Motion, the June 2024 affidavits omit multiple streams of evidence from forensic and eyewitness sources disproving CC1's account of the June 9, 2024 shooting, including evidence the FBI *itself* collected immediately after the shooting. *See* Dkt. 119 at 14–17. Despite having obtained evidence showing the shooting was a random encounter between strangers and was initiated by CC1, the government doubled down in the rollover affidavit on its erroneous speculation about the Duongs' involvement in the shooting, citing to cherry-picked information gleaned from the June 20, 2024 searches that it argued bolstered its initial theory regarding the Duongs. *Id.* at 16; Dkt. 120-2 ¶¶ 13–14. It omitted a ShotSpotter report indicating that CC1 fired multiple rounds at the gunmen before they ever fired a single round. Dkt. 119 at 15; Dkt. 120-20 at 4–5. ███████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

## 2. The Omissions Undermine Probable Cause

These omissions are material because they deprived the magistrate judges who signed the June 2024 warrants of vital information: CC1's statements, upon which the applications chiefly relied for probable cause, were worthless. When these unreliable statements are properly cast aside, the affidavits lack probable cause to search A. Duong and his property.

Once omissions made knowingly or with reckless disregard for the truth are identified in the affidavit, under the second prong of the *Franks* analysis, the court must determine whether those omissions are material to the finding of probable cause. 438 U.S. at 155–56. As set forth in D. Duong's Motion, the key inquiry for materiality is "whether probable cause remains once the evidence presented to the magistrate is supplemented with the challenged omissions" and the court disregards any false information included in the warrant affidavit. Dkt. 119 at 9–10 (citing cases). This exercise involves

12

striking the false statements and restoring the omissions in the affidavit so that it may be determined whether there is a substantial basis to conclude that contraband or evidence of a crime will be found in a particular place. *Stanert*, 762 F.2d at 775; *see also United States v. Esparza*, 546 F.2d 841, 844 (9th Cir. 1976).

Courts in the Ninth Circuit routinely invalidate warrants when the supporting affidavits omit critical impeachment information about an unreliable informant, like CC1. *See* Dkt. 119 at 18–20 (citing cases). As D. Duong's Motion explains, extreme caution is necessary when a warrant affidavit relies on criminally compromised informants like CC1 because they often "manufacture evidence to create something of value, setting up and betraying friends, relatives" in order to "'get' a target of sufficient interest to induce concessions from the government." Dkt. 119 at 10–11; *Commonwealth of Northern Mariana Islands v. Bowei*, 243 F.3d 1109, 1124 (9th Cir. 2001).

For this reason, courts, including in the Ninth Circuit, require that applications relying on an unreliable informant's statements be corroborated by multiple independent sources. *E.g.*, *United States v. Loloee*, 2025 WL 671107 (E.D. Cal. Mar. 3, 2025); *United States v. Bennett*, 219 F.3d 1117 (9th Cir. 2000). For example, in *Loloee*, the affidavit supporting a search warrant alleged that the defendant illegally employed people not authorized to work in the United States but omitted material impeachment information as to the credibility of several witnesses who testified to this allegation. *Id.* at *17–*18. The court did not find that this was detrimental to the warrant, however, because the affidavit did not "rely[] on [the compromised sources'] claims alone to establish probable cause." *Id.* at *17. The court reasoned that the government conducted a thorough investigation to "verify" the compromised sources' claims, which was demonstrated by the affidavit's incorporation of "evidence from multiple, independent sources." *Id.*; *cf. United States v. Hall*, 113 F.3d 157, 160–61 (9th Cir. 1997) (warrant invalid when impeachment information about an informant's conviction was not disclosed to the magistrate and probable cause depended entirely on the word of the informant).

### a. June 14, 2024 affidavit

The June 14, 2024 affidavit wields CC1's statements to support nearly every allegation involving A. Duong, with many of the affidavit's core allegations relying *exclusively* on CC1's statements. For instance, the allegations that any purported deal was ever reached between CC1 and

13

Thao on October 7, 2022, and that A. Duong met with CC1 and Thao four days later to solidify the terms, derive solely from CC1's uncorroborated statements. *Id.* ¶¶ 55, 57, 131. The affidavit never alleges that A. Duong had any foreknowledge of CC1's October 7, 2022 meeting with Thao or CC1's intentions to propose a bribery scheme at that meeting. *Id.* ¶¶ 49–52. Instead, it only signals that CC1 hatched, initiated, and executed any such scheme all on their own, or more likely, that they made it all up.[8] Similarly, the allegation that A. Duong attended a March 9, 2023 meeting at Skates on the Bay where supposedly the core of the scheme was reaffirmed and terms renegotiated rests entirely on CC1's statements to the FBI. *Id.* ¶¶ 81–82.

The affidavit's conclusions of wrongdoing, even if informed by some additional measure of alternative evidence, should be disregarded because CC1's statements are what give even that evidence its incriminating texture. For example, after discounting CC1's statements about an alleged deal, the texts exchanged between A. Duong and CC1 on November 18, 2022 about the local District Attorney election results merely convey a tongue-in-cheek reaction to the consequence of the winner being a candidate CC1 did not support, followed by A. Duong's riposte ascribing that apparently unexpected electoral outcome to a common adage about politics.[9] *Id.* ¶¶ 74–77. The same goes for dozens of other, predominantly one-sided, messages sent by CC1 that A. Duong generally did not acknowledge, respond to, or meaningfully engage with. *Id.* ¶¶ 64, 79–80, 97–98, 116.

Other allegations in the affidavit stem from incriminating interpretations (sourced from CC1's statements) of otherwise benign evidence involving A. Duong. For example, the affidavit alleges that

---

[8] CC1 spammed A. Duong with several messages: "Meet with Sheng," "She will buy 100 units," "If mayor," "One catch." Ignoring CC1's message about a "catch," Andy Duong responds, "Guaranteed?" CC1 then mentions a "$300k contract," and Andy Duong again ignores CC1. *Id.* CC1 sends another message that "Sheng is going to call you re $$," Andy Duong responds, "Lol" and "What money?" *Id.* ¶¶ 53–55.

[9] CC1, "So we may go to jail … But we are $100 million dollars richer." A. Duong, "Money buys everything;" CC1, "You are right! … Plus we have a 10 year extension to CWS." Dkt. 120-1 ¶¶ 74–76. Although CC1 inserts unexplained references to a large sum and separately to CWS, A. Duong never responds to those non sequiturs.

in mid-October 2022, A. Duong instructed CC1 via text to fabricate invoices to disguise the true nature of a $75,000 check that CC1 claimed was for the negative mailers. *Id.* ¶¶ 68–69. Removing CC1's unreliable statements, the interpretations of the texts and the resulting conclusion clings to two crumbs of insufficient circumstantial evidence: the date that CC1 deposited the check, and the supposed correlation between the amount of the check and the cost of the mailers. *Id.* ¶ 65. Elsewhere in the affidavit, CC1 allegedly paid the print shop owner well over $75,000 by wire transfer and bounced checks. *Id.* ¶ 72. Another section of the affidavit introduces yet another potential price for the mailers, explaining that an independent expenditure form was filed by CC1 on or around January 30, 2023, which claimed cumulative expenditures in November 2022 for the 2022 Oakland mayoral election mailers well into six figures. *Id.* ¶ 16. Moreover, aside from noting in passing CC1's baseless statements about CC1's belief that the date is incorrect, the affidavit never grapples with the fact that the $75,000 check is dated September 29, 2022—nearly two weeks *before* the supposed agreement for the mailers was allegedly solidified or CC1 first contacted the print shop owner to commission the negative mailer job. *Id.* ¶¶ 65, 132 n.20.

The affiant also interprets CC1's texts on March 16 and 17, 2023 as communicating Jones's request for additional money upfront per the alleged agreement that was supposedly reached at the Skates on the Bay meeting, and A. Duong's text about a check as an agreement to provide such funds. *Id.* ¶ 84. In support, the affidavit merely alleges that CC1's texts were close in time to separate requests CC1 sent Jones for his help with selling EH container homes. *Id.* ¶ 85. No source other than CC1's unreliable statements supports the affiant's reading of A. Duong's message.

Other March 26, 2023 messages between CC1 and A. Duong suffer from the same defects. According to the affidavit, the texts allegedly (1) reflect surprise about the obligation to submit an official proposal to Oakland for EH funding, and (2) show that A. Duong endorsed the terms of the alleged bribe as laid out by CC1. *Id.* ¶¶ 87, 89, 92.[10] But these inculpatory interpretations only rely

_____

[10] In response to texts from CC1 regarding Jones generally "want[ing] direct access [to $$]," A. Duong responds with texts including to complain about Jones "playing the game," and saying, "Ain't nothing free or front cuz we did all that to help her ass win." *Id.* ¶¶ 88, 89. Other text messages are allegedly regarding the Apple note CC1 created. CC1 writes: "…Am I missing something? We are missing communications assignments." A. Duong responds to the inquiry about communications assignments, replying "Not missing" and "All right." *Id.* ¶ 92.

on CC1's account. *Id.*

Finally, the allegations linking A. Duong to any alleged attack on CC1 on May 3, 2024 and June 9, 2024 are insufficient to support probable cause for the searches because they also derive from CC1's unreliable statements. The only other evidence cited in support of the allegations as to A. Duong regarding the May 3, 2024 incident is toll records showing that he communicated with OPD and his family. *Id.* ¶¶ 122–24. But these fail to corroborate CC1's account. First, the alleged timeline of the incident rests solely on CC1's statements, which are generally unreliable and, on this point, inconsistent. *Id.* ¶ 119 n.16. Absent any reliable timeline, A. Duong's call logs on May 3 and 4, 2023 are irrelevant. Second, records of phone calls between family members who routinely communicate with each other, including for work, are not enough by themselves to show that they were orchestrating an assault. Finally, records showing that A. Duong called the OPD emergency line tend to show that he *wasn't* involved in an assault on CC1 because that would mean that he was calling police to report on himself. And the affiant's conclusion that the June 9, 2024 shootout outside CC1's house was a coordinated hit against CC1 involving the Duong family, *id.* ¶ 144, is also based primarily on CC1's statements, combined with mere circumstantial evidence regarding the correlation between the timing of the shooting (June 9) and CC1's first interview with the FBI (June 6), and contemporaneous toll records showing A. Duong communicated via phone with an Asian male that the FBI initially and erroneously suspected as being involved in the shooting. *Id.* ¶¶ 144, 148–50. Crucially, the affiant never alleges that the Duongs were aware of CC1's cooperation with the FBI, which renders both incidents entirely irrelevant to the specific bribery offense that is the actual subject of the June 2024 warrants.

Unlike the warrants in *Loloee* and *Bennett* that were saved by "evidence from multiple, independent sources," the June 14, 2024 warrant has a remarkable dearth of independently sourced evidence corroborating CC1's word, the remainder of which is glaringly insufficient to establish probable cause for the alleged crime.

Here, to search and seize information from A. Duong related to an alleged bribery, the government must provide probable cause (1) that he acted "corruptly" to give, offer, or agree to give a thing of value "with intent to influence" a government agent, 18 U.S.C. § 666(a)(2), and (2) that

16

evidence of the crime would be found in the place to be searched.  Absent the evidence and conclusions drawn directly from CC1's statements, the affidavits do not satisfy even the first requirement.  The same issue plagued a challenged warrant in *Donahoe v. Arpaio*, 986 F. Supp. 2d 1091 (D. Ariz. 2013).  There, the affidavit contained misleading statements and omissions regarding evidence of bribery.  *Id.* at 1112–15.  The court found the misstatements material to the finding of probable cause because "[a]bsent the misrepresentations," all that was left were "two [trivial] facts," and as a result, "the affidavit does not satisfy" the basic requirement to provide reason to believe "that a crime was committed." *Id.* at 1116.

Like *Donahoe*, the evidence that remains after disregarding CC1's misstatements—including texts and toll records—is trivial and, even making reasonable inferences, provides no reason to believe that A. Duong acted with a corrupt intention to effectuate a bribe.  When viewed as a whole, the existence of a so-called bribe hinges on CC1's self-serving account of certain meetings at which a corrupt deal was supposedly formed.  *Supra* at Section II.C.  None of the subsequent documentary evidence cited in the affidavit suffices to show a crime was committed because the relevance of such evidence relies on the agent's interpretations, which in turn rely on his earlier conclusions about the bribe that CC1 alone claims existed.  *Supra* at Section II.C.

To the extent the affiant relies on his generic training, experience, and knowledge of the investigation as an independent source of evidence, that also falls short.  As an initial matter, Agent Haunold's specific experience in the area of public corruption investigations is limited, which is unsurprising given that he was employed by the FBI (inclusive of training) for only three years at the time of the affidavit.  *See* Dkt. 120-1 ¶¶ 4–5.  And even allegations based on the affiant's training and experience must derive from and build upon proper "foundational facts," lest they be "mere conclusions" that are "entitled to little weight." *United States v. Cervantes*, 703 F.3d 1135, 1139 (9th Cir. 2012) (citing *United States v. Thomas*, 211 F.3d 1186, 1190 (9th Cir. 2000)).  While a court may consider an affiant's "training and experience," it is incumbent upon him to "explain the nature of his expertise or experience and how it [bore] upon the facts which prompted" the search. *Id.* at 1139-40; *see also United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir. 1990) (invalidating warrant to search a defendant's home for child pornography for lack of probable cause because the affidavit relied on an

17

expert's "rambling boilerplate" generalizations about what is typically found in the homes of various categories of sexual offenders without sufficient case-specific facts).

**b.    June 20, 2024 rollover affidavit**

To the extent that the rollover affidavit incorporates and relies on the original affidavit, the material omissions analyzed above likewise undermine probable cause to seize the additional items described in the rollover affidavit. In addition, the new evidence cited in the rollover affidavit does not supply probable cause for its seizure when divorced from CC1's unreliable statements.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████ Without CC1's statements, A. Duong's mere possession of these items does not provide probable cause for any alleged crime—which in any event has nothing to do with the specific bribery offense that is the actual subject of the June 2024 warrants.

In addition, without CC1's statements, the remaining evidence in the rollover affidavit allegedly connecting A. Duong to the June 9, 2024 shooting is shockingly trivial. It consists of the affiant's impression that an Asian male initially and erroneously suspected by the FBI as being involved in the shooting was "agitated" when questioned about their communications with A. Duong. Dkt. 120-2 ¶ 17. ████████████████████████████████████████

████████████████████████████████████████████████

█████████████ Yet, contrary to CC1's unsubstantiated statement that one of the shooters was an Asian male, multiple independent witnesses confirmed that the shooting actually was between CC1 and two Mexican or Hispanic males. Dkt. 120-1 ¶¶ 146–47. ███████████████████

██████████████████████████████ ██████████████████████████████████████████████

████████████████████████████████████████████.[12]  And of course, OPD's

ultimate investigation, arrest, and charging of the shooting as an offense wholly unrelated to the Duongs

vividly illustrates the dangerous error in the affidavit's utter reliance on CC1.  *See supra* note 3.

***

Taken together, all the affidavits' material omissions undermine any finding of probable cause

as to A. Duong.  As explained in D. Duong's Motion, *Leon*'s good faith exception cannot save the June

2024 warrants because officers may not reasonably rely on a warrant issued based on

misrepresentations and omissions.  Dkt. 119 at 11; *Leon*, 468 U.S. at 922–23.

### 3.     Probable Cause Did Not Exist to Search Andy Duong's Home and Car

Notwithstanding the material omissions that fatally plague the June 2024 search warrant

applications, the affidavits also fail to supply a reasonable nexus between A. Duong's home or vehicle

and the conduct alleged in the affidavits.  As explained in D. Duong's Motion, probable cause that a

crime has been committed is not by itself adequate to search a defendant's home because "the home is

entitled to special protection as the center of [] private [life]."  Dkt. 119 at 20, citing *Georgia v.

Randolph*, 547 U.S. 103, 115 (2006).  There must be "reasonable cause to believe that the things listed

as the objects of the search are located in the place to be searched" and a "reasonable nexus between

the activities supporting probable cause and the locations to be searched."  *United States v. Pitts*, 6 F.3d

1366, 1369 (9th Cir. 1993) (citations omitted).  Suppression is proper when a warrant "contains no

facts making it likely that anything the officers sought was present" in a residence.  Dkt. 119 at 20,

citing *United States v. Ramos*, 923 F.2d 1346, 1352 (9th Cir. 1991).

**June 14, 2024 Warrant:** The allegations described in the June 14, 2024 affidavit focus on

specific in-person meetings or altercations at Seabreeze on the Dock, Skates on the Bay, Peet's Coffee,

---

[11] ███████████████████████████████████████████████████████████

[12] ████████████████████████████████████████████████████████████████████████████

1211 Embarcadero, and CC1's home; electronic communications and documents (that the government already had collected pursuant to prior warrants); and various financial transactions. Yet at no point does the affidavit allege or identify facts pointing to any meetings in A. Duong's home or vehicle; any relevant mailing to or from A. Duong's home address; or any use of his home or car to store or transport people, money, or records related to the alleged scheme. Nor does the affidavit allege specific facts that agents would expect to find hard copies or local devices containing any such evidence in A. Duong's home or car. Instead, it offers boilerplate recitations throughout about what might be found in A. Duong's home or car. Dkt. 120-1 ¶ 166. As just one example, the affiant asserts that he is aware that computer equipment was used in connection with documents used in the alleged bribery scheme, including to print relevant documents, to justify his belief that such a computer was located in A. Duong's house and car. *Id.* ¶ 167(e). But the only printout evidence alluded to in the affidavit was produced at a third-party print shop, not A. Duong's house. *Id.* ¶¶ 32–33, 61. Even more perplexing is that CC1 specifically told the affiant that CC1 had never seen A. Duong use a laptop. *Id.* ¶ 142 n.29.

**June 20, 2024 Rollover Warrant:** The rollover warrant suffers from the same and even more defects. The rollover warrant authorizes agents to search and seize additional items discovered in A. Duong's home and car. Dkt. 120-2 ¶¶ 13–16. But any reasonable cause to seize these additional items relies chiefly on (1) the fruits discovered in the Duongs' home and A. Duong's car while executing the original warrant, and (2) information and items from the search of the individual wrongly suspected of the shooting. *Id.* Neither of these suffice.

*First*, because the original warrant was defective as to the search of the Duongs' home and A. Duong's car, the items that agents found there pursuant to it must be excluded as "derivative of an illegality," the so-called "fruit of the poisonous tree." *See Ngumezi*, 980 F.3d at 1290 (citations omitted); *United States v. Pulliam*, 405 F.3d 782, 785 (9th Cir. 2005) ("[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"). But even if the Court doesn't agree that the original warrant was defective, the items discovered in the Duongs' homes and A. Duong's car should nevertheless be disregarded in analyzing whether the rollover affidavit demonstrated probable cause because the items themselves cannot be used to show probable

cause for their own seizure. *United States v. Barajas*, 517 F. Supp. 3d 1008, 1025 –26 (N.D. Cal. 2021). More fundamentally, the best indication that the items sought to be seized by the rollover warrant have absolutely no nexus to the charged bribery scheme is the fact that none of that evidence is cited or otherwise relied upon in the indictment.

*Second*, the new non-seized evidence cited in the rollover warrant affidavit is far too attenuated to supply a sufficient basis for the seizures in the home and car, even when paired with the incorporated original affidavit. For example, the new evidence cited in the rollover warrant that was gathered from the search of the individual wrongly suspected of the shooting, including evidence of his purported "agitation" regarding CC1, and the toll records of their communications with A. Duong, does not provide any proper basis. As an initial matter, the purported connection between the wrongly suspected individual and the June 9, 2024 shootout depends on CC1's description of one of the gunmen as an Asian male (which the subsequent OPD investigation ultimately dispelled). Dkt. 120-1 ¶ 146. But the warrant affidavits contain far more corroboration that Mexican or Hispanic men were involved in the shootout outside CC1's house. *Id.* ¶ 147. Additionally, the financial documents found at the wrongly suspected individual's residence are also too attenuated to establish reasonable cause to seize the rollover items from A. Duong's home, given that the affidavit fails to draw any connection between those documents and the alleged bribery in this case, the offense giving rise to the warrant in the first place.

*Leon*'s good faith exception does not save either warrant. Although the Fourth Amendment generally does not require suppression of evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant," *Leon*, 468 U.S. at 922–923, both affidavits are so lacking in facts connecting A. Duong's residence or vehicle to the alleged bribery scheme that no reasonable officer could have believed it established the constitutionally required basis for those searches. *See* Dkt. 119 at 22 (citing analogous cases).

## B. Other Warrants Obtained Are Impermissibly Overbroad

Finally, aspects of the February, March, and May 2024 warrants to search A. Duong's iCloud and Microsoft accounts were overbroad. As explained in D. Duong's Motion, a search warrant is overbroad if it authorizes the search and seizure of items that fall outside the scope of the probable

cause underlying the warrant, and suppression is the appropriate remedy. Dkt. 119 at 22, citing *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009). A court may "strike from a warrant those portions that are [unconstitutionally broad]," and "preserve those portions that satisfy the Fourth Amendment." *Id.* Three categories of information are overbroad: (1) the March 2024 cell phone warrant is overbroad in its authorization to search and seize data other than location data, (2) the February 2024 iCloud and May 2024 Microsoft warrants are overbroad in their authorization to search and seize documents regarding interactions between "any" state or local government or officials, and (3) the February 2024 iCloud and May 2024 Microsoft warrants are additionally overbroad in their authorization to search and seize evidence dated before December 1, 2021. The good faith exception does not apply to any of these categories.

### 1. The March 22, 2024 Cell Phone Warrant Is Partially Overbroad

The March 22, 2024 warrant and affidavit are identical as to all Defendants, including A. Duong. *See* Dkt. 120-3. As detailed in D. Duong's Motion, the affidavit establishes, at most, probable cause to obtain location information associated with the Defendants' cell phones. Dkt. 119 at 23. It explicitly seeks only location data and cabins its justifications for the warrant to such data. *Id.*; Dkt. 120-3 ¶ 1. The crux of the affidavit is that it seeks historical cell site records to confirm the Defendants' attendance at certain meetings. Dkt. 120-3 ¶ 88. The warrant is not so limited. It authorizes the government to seize additional information: subscriber identities and addresses; billing and payment information; account start and service records; device and instrument identifiers; and complete connection/session records, including IP addresses, sector information, and timing-advance data. *Id.*, Attachment B-2. None of those categories finds support in the affidavit's theory of probable cause.

### 2. The February and May 2024 Warrants Are Partially Overbroad

The February 23, 2024 and May 7, 2024 warrants authorizing searches of A. Duong's iCloud and Microsoft accounts are each overbroad in two principal ways.[13] First, both warrants authorize the seizure of materials "related to any interactions between [CWS representatives], and *any* state or local

---

[13] A. Duong has standing to challenge the May 7, 2024 search warrant for information associated with his CWS Microsoft email account. *See United States v. Ziegler*, 474 F.3d 1184, 1190 (9th Cir. 2007).

government body or government officials." Chan Decl. Ex. 5, Attachment B at 6; Chan Decl. Ex. 6, Attachment B at 5 (emphasis added). Yet each affidavit confines the defined investigation and assertions in support of probable cause solely to alleged activities related to a limited set of enumerated public officials.[14] Chan Decl. Ex. 5 ¶¶ 22, 105; Chan Decl. Ex. 6 ¶¶ 25, 145. By sanctioning searches related to "any" state or local government body or official, the warrants run afoul of the Fourth Amendment because they sweep in evidence involving officials outside those specifically named and whose alleged conduct is described in the affidavit, all without providing any probable cause support whatsoever. *See, e.g.*, *United States v. Spilotro*, 800 F.2d 959, 963–67 (9th Cir. 1986) (affirming suppression where a warrant's "authorization to seize 'gemstones and other items of jewelry' was far too broad," given the affidavit "mentioned only a few stolen diamonds"); *SDI Future Health, Inc.*, 568 F.3d at 703–04.

The warrants are also defective because they both authorize the search and seizure of evidence outside the date range for which any facts underlying probable cause are alleged in the affidavits. The iCloud warrant authorizes the search and seizure of documents from January 1, 2020 to February 23, 2024. Chan Decl. Ex. 5, Attachment B at 3, 5. But nothing in the affidavit supports the seizure of materials before December 2021. *Id.* ¶¶ 85–92. The only references to earlier events in the affidavit appear in footnotes 14 (which does not implicate A. Duong) and 19 (which refers to a different investigation covering a different time frame and expressly states that it does not contribute to establishing probable cause), but neither supports the need for the enlarged temporal scope. *Id.* ¶¶ 97 n.14, 104 n.19. The Microsoft warrant authorizes the search and seizure of documents dating back even further, to January 1, 2019. Chan Decl. Ex. 6, Attachment B at 3–4. But, as with the iCloud warrant, the earliest date associated with any potentially relevant allegation described in the affidavit is almost three years later, around December 2021. *See, e.g.*, *In re Search of Google Accts. identified in Attachment A*, 92 F. Supp. 3d 944, 952–53 (D. Alaska 2015) (denying government's ex parte warrant application when the affidavit established probable cause to search for evidence within a specified time

---

[14] February 2024 affidavit: ██████████████████████████ Chan Decl. Ex. 5 ¶¶ 22, 105. May 2024 affidavit: ██████████████████████████████ Chan Decl. Ex. 6 ¶¶ 25, 145.

period yet government did not confine its warrant application to that known time period); *United States v. Lofstead*, 574 F. Supp. 3d 831, 843 (D. Nev. 2021) (granting motion to suppress for overbreadth when there was probable cause to search for data only in a "limited window of time" but resulting "warrant did not reflect that limitation").

***

All three warrants' defects require suppression of the out-of-scope evidence. The good faith exception is inapplicable to the conduct of the agents because the infected portions of each warrant are "so facially deficient" that they should have recognized it exceeded the scope of evidence for which the corresponding affidavit alleges probable cause. *Leon*, 468 U.S. at 923. Courts refuse to apply the good faith exception when no evidence suggests that the officers could reasonably presume either warrant to be valid given the incongruities with their respective affidavits. *E.g.*, *Ctr. Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747, 753 (9th Cir. 1989); *SDI Future Health, Inc.*, 568 F.3d at 706 (good faith exception inapplicable when there was "no evidence … agents in fact relied on the affidavit to restrict their search").

## V. CONCLUSION

For the reasons stated above, A. Duong respectfully requests that this Court (1) order a *Franks* hearing regarding the June 2024 affidavits' failure to disclose relevant information about CC1, (2) suppress evidence stemming from the search of his residence and vehicle, and from the room of D. Duong's house that the government alleges is attributable to A. Duong[15] pursuant to both June 2024 warrants, (3) suppress evidence, other than location data, seized pursuant to the overbroad March 2024 warrant for his cellular phone records, (4) suppress evidence regarding "any" state or local government or officials, other than that regarding the limited set of public officials enumerated in the accompanying affidavits, seized pursuant to the overbroad February 2024 iCloud and May 2024 Microsoft warrants, and (5) suppress evidence pre-dating December 1, 2021, seized pursuant to the overbroad February

---

[15] By both joining in D. Duong's motion and filing the instant motion, A. Duong seeks to suppress everything seized in the room of D. Duong's house that the government alleges is attributable to A. Duong. *See, e.g., United States v. Davis*, 932 F.2d 752, 757 (9th Cir. 1991) (finding that defendant had a legitimate expectation of privacy in another's apartment because he could access it and stored items there); *United States v. Patterson*, 276 F.Supp.3d 994, 999–1000 (S.D. Cal. 2017) (similar).

2024 iCloud and May 2024 Microsoft warrants.

DATED: December 4, 2025                    Respectfully submitted,

                                           By: */s/ Winston Y. Chan*
                                               Winston Y. Chan
                                               Hannah Erin Stone
                                               GIBSON, DUNN & CRUTCHER LLP

                                               W. Douglas Sprague
                                               COVINGTON & BURLING LLP

                                               Erik Babcock
                                               LAW OFFICES OF ERIK BABCOCK

                                               Attorneys for Defendant Andy Hung Duong