Winston Y. Chan (SBN 214884)
Hannah Erin Stone (SBN 339612)
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8362
Facsimile: (415) 393-8306
Email: wchan@gibsondunn.com

W. Douglas Sprague (SBN 202121)
**COVINGTON & BURLING LLP**
415 Mission Street, Suite 5400
San Francisco, California 94105
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: dsprague@cov.com

Erik Babcock (SBN 172517)
**LAW OFFICES OF ERIK BABCOCK**
420 3rd Street, Suite 250
Oakland, California 94607
Telephone: (510) 452-8400
Facsimile: (510) 201-2084
Email: erik@babcocklawoffice.com

Attorneys for Defendant Andy Hung Duong

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4:25-CR-00003-YGR |
| Plaintiff, | **PUBLIC FILING OF DEFENDANT ANDY HUNG DUONG'S REPLY IN SUPPORT OF JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR *FRANKS* HEARING AND DECLARATION IN SUPPORT THEREOF** |
| v. | |
| SHENG THAO, ANDRE JONES, DAVID TRUNG DUONG, and ANDY HUNG DUONG, | |
| Defendants. | |

1

Pursuant to the parties' stipulation and proposed order regarding sealing, Dkt. 191, and the Court's order granting the parties' stipulation regarding sealing, Dkt. 193, Defendant Andy Hung Duong hereby files a partially unredacted version of his Reply in Support of Joinder and Motion to Suppress and for *Franks* Hearing, Dkt. 163, and an unredacted version of the Declaration of Winston Y. Chan in support thereof.  This declaration was previously filed under seal in connection with Defendant Andy Duong's Administrative Motion to Seal, Dkt. 164, filed on January 29, 2026.

DATED: May 6, 2026                                  Respectfully submitted,


By: */s/ Winston Y. Chan*
       Winston Y. Chan
       Hannah Erin Stone
       GIBSON, DUNN & CRUTCHER LLP

       W. Douglas Sprague
       COVINGTON & BURLING LLP

       Erik Babcock
       LAW OFFICES OF ERIK BABCOCK

       Attorneys for Defendant Andy Hung Duong

PUBLIC FILING OF DEFENDANT ANDY HUNG DUONG'S REPLY IN SUPPORT OF JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR *FRANKS* HEARING AND DECLARATION IN SUPPORT THEREOF
CASE NO. 4:25-CR-00003-YGR

Winston Y. Chan (SBN 214884)
Hannah Erin Stone (SBN 339612)
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 393-8362
Facsimile: (415) 393-8306
Email: wchan@gibsondunn.com

W. Douglas Sprague (SBN 202121)
**COVINGTON & BURLING LLP**
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: dsprague@cov.com

Erik Babcock (SBN 172517)
**LAW OFFICES OF ERIK BABCOCK**
420 3rd Street, Suite 250
Oakland, CA 94607
Telephone: (510) 452-8400
Facsimile: (510) 201-2084
Email: erik@babcocklawoffice.com

Attorneys for Defendant Andy Hung Duong

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 4:25-CR-00003-YGR |
| Plaintiff, | **DEFENDANT ANDY HUNG DUONG'S REPLY IN SUPPORT OF JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR *FRANKS* HEARING** |
| v. | |
| SHENG THAO, ANDRE JONES, DAVID TRUNG DUONG, and ANDY HUNG DUONG, | Hearing Date: March 5, 2026 |
| Defendants. | Hearing Time: 10:00 a.m.<br>Judge:  Hon. Yvonne Gonzalez Rogers<br>Courtroom:  1, 4th Floor |

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION.............................................................................................................1

II.  ARGUMENT ...............................................................................................................1

    A.   Suppression Should Be Granted Without A Hearing.........................................1

        1.   The June 2024 Affidavits Lacked Probable Cause to Search A. Duong's Home and Car .........................................................................................................1

        2.   Aspects of the Other Challenged Warrants Are Overbroad...............................3

    B.   Alternatively, a *Franks* Hearing is Required as to the June 2024 Warrants ...................5

        1.   The Affiants' Omissions About Alleged Coordinated Attacks On CC1 Independently Justify A *Franks* Hearing ..........................................................5

        2.   Other Reckless Omissions Underscore Materiality ..........................................10

III. CONCLUSION.............................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Franks v. Delaware*,
  438 U.S. 154 (1978) .................................................................................................................7

*Payton v. New York*,
  445 U.S. 573 (1980) .................................................................................................................2

*Pitts v. District of Columbia*,
  177 F. Supp. 3d 347 (D.D.C. 2016) .........................................................................................2

*United States v. Allen*,
  481 F. App'x 308 (9th Cir. 2012) .............................................................................................6

*United States. v. Cervantes*,
  703 F.3d 1135 (9th Cir. 2012) ................................................................................................13

*United States v. Chesher*,
  678 F.2d 1353 (9th Cir. 1982) .............................................................................................7, 8

*United States v. Davis*,
  617 F.2d 677 (D.C. Cir. 1979) ...............................................................................................10

*United States. v. DeLeon*,
  979 F.2d 761 (9th Cir. 1992) ....................................................................................................7

*United States v. Fox*,
  790 F. Supp. 1487 (D. Nev. Mar. 24, 1992) ............................................................................8

*United States v. Hall*,
  113 F.3d 157 (9th Cir. 1997) .............................................................................................13, 14

*United States v. Lam*,
  2020 WL 4349851 (N.D. Cal. July 29, 2020) ..........................................................................5

*United States v. Leon*,
  468 U.S. 897 (1984) .................................................................................................................4

*United States v. Liang Chen*
  2020 WL 6585803 (N.D. Cal. Nov. 10, 2020) .........................................................................5

*United States v. Kvashuk*,
  29 F.4th 1077 (9th Cir. 2022) ...................................................................................................2

*United States v. Meling*
  47 F.3d 1546 (9th Cir. 1995) .............................................................................................13, 14

*United States v. Miller*,
  753 F.2d 1475 (9th Cir. 1985) ..................................................................................................8

ii

*United States v. Monreal-Rodriguez*,
    2022 WL 2442238 (D. Ariz. Jan. 3, 2022)......................................................................................4

*United States v. Sayakhom*,
    186 F.3d 928 (9th Cir. 1999)...............................................................................................2, 3

*United States v. Tanguay*,
    787 F.3d 44 (1st Cir. 2015) ..................................................................................................7, 8

*United States v. Underwood*,
    725 F.3d 1076 (2013) ...............................................................................................................3

*United States v. Washington*,
    797 F.2d 1461 (9th Cir. 1986)..................................................................................................4

*United States v. Weber*,
    923 F.2d 1338 (9th Cir. 1990)..................................................................................................3

**Statutes**

18 U.S.C. § 1512 ........................................................................................................................9

ANDY DUONG'S REPLY IN SUPPORT OF JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR
*FRANKS* HEARING
CASE NO. 4:25-CR-00003-YGR

## I.    INTRODUCTION

The government's opposition to Andy Duong's Joinder and Additional Motion to Suppress and for a *Franks* Hearing (the "Motion") falls short for two key reasons.

*First*, the government offers no meaningful response to the lack of probable cause for the June 2024 warrants, and certain parts of the February and May 2024 warrants, thereby providing the Court with ample basis to grant suppression without even holding a hearing.  The government fails to assert any reasonable nexus between the alleged bribery scheme and A. Duong's home and car and instead resorts to defending the June 2024 warrants by making the unprecedented assertion that the Fourth Amendment permits law enforcement to categorically search the homes of any and all suspects in "white-collar and fraud cases."  In addition, the government provides unconvincing justification for the search and seizure of digital evidence in sweeping excess beyond the scope of the particularized allegations within the February and May 2024 warrants.

*Second*, even if the Court declines to suppress the June 2024 warrants on the motion papers, it should still grant a *Franks* hearing.  Both June 2024 affidavits recklessly—and in some circumstances knowingly—omitted evidence that would have dissuaded any magistrate from crediting the salacious (and untrue) allegations that the Duongs coordinated an assault and shooting on CC1.  These claims necessarily were factored into the magistrates' probable cause determinations because, at a minimum, they provided the sole basis for the government's requested authority to seize any supposed assault- and shooting-related physical evidence during the June 2024 searches.  More fundamentally, the two affidavits concealed CC1's lengthy history of defrauding business partners and then weaponizing law enforcement to escape the consequences of their own criminality.

## II.    ARGUMENT

### A.    Suppression Should Be Granted Without A Hearing

#### 1.    The June 2024 Affidavits Lacked Probable Cause to Search A. Duong's Home and Car

In disputing A. Duong's argument that the June 2024 affidavits failed to provide a reasonable nexus between his home and car and the alleged activities supporting probable cause, Dkt. 138 (hereinafter cited as "Mot.") at 19–21, the government remains unable to point to anything in the June

1

2024 affidavits purportedly linking that property to a single meeting, mailing, or other action that occurred in furtherance of the alleged scheme. Nor does the government address the glaringly contradictory facts that *are* within the affidavits: that CC1 told the affiant for the original warrant, Special Agent Haunold, that they had never seen A. Duong use a laptop, and that the only referenced computer printouts came from a third-party shop rather than A. Duong's home. Mot. at 20 (citing Dkt. 120-1 ¶¶ 32–33, 142 n.29).

Instead, the government asks the Court to deem it "sufficient" that Agent Haunold did nothing more than recite the law enforcement trope "that subjects in white-collar and fraud cases often keep relevant documentary and electronic evidence at their residences."[1] Dkt. 151 (hereinafter cited as "Opp.") at 33. But such a categorical rule would obliterate the reasonable nexus requirement. *See, e.g.*, *Pitts v. District of Columbia* , 177 F. Supp. 3d 347, 369 (D.D.C. 2016) ("permit[ting] generalized, boilerplate averments regarding an officer's 'training and experience' in dealing with broad classes of suspects grouped together on the basis of their alleged criminal conduct to stand in for particularized facts about a specific suspect, his or her specific conduct, and his or her specific residence . . . comes dangerously close to obviating the [home search warrant standard]").

Notwithstanding that the "chief evil" deterred by the Fourth Amendment is the "physical entry of the home," *Payton v. New York*, 445 U.S. 573, 585 (1980), the government devotes a scant two paragraphs in support of this novel blanket search authority. Opp. at 32–33. And even then, the two Ninth Circuit cases cited by the government are distinguishable. In *United States v. Kvashuk*, 29 F.4th 1077 (9th Cir. 2022), the affidavit set forth specific facts linking the defendant's alleged cybercrimes to the home itself, including facts indicating that the IP address assigned to the house was used during the relevant time period to access online accounts used for the scheme. *Id.* at 1086. And in *United States v. Sayakhom*, the court affirmed the denial of a motion to suppress where the defendant conceded the existence of probable cause to believe that she was engaging in mail fraud, and the affiant's assertion that operators of businesses that involve paperwork typically carry business records in their

---

[1] The government does not address at all, and thus concedes, both the deficient nexus supporting the search of A. Duong's car, as well as his argument that any items discovered in the search on June 20, 2024 cannot provide probable cause for their own seizure, Mot. at 20–21.

ANDY DUONG'S REPLY IN SUPPORT OF JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR *FRANKS* HEARING
CASE NO. 4:25-CR-00003-YGR

cars and to and from their residences was supported by other allegations in the affidavit establishing that the entire business was "merely a scheme to defraud." 186 F.3d 928, 934 (9th Cir. 1999).

By contrast, in *United States v. Weber*, the Ninth Circuit reversed the trial court's denial of a suppression motion where the supporting affidavit improperly relied on an expert's "rambling boilerplate recitations designed to meet all law enforcement needs" and that were "not drafted with the facts of [the] case or [the] particular defendant in mind." 923 F.2d 1338, 1345 (9th Cir. 1990). The court found an insufficient nexus between the specific defendant's home and the expert's generalizations about child pornography collectors. Importantly, the court declined to apply the good faith exception because the government acted unreasonably in relying on the foundationless expert testimony and, stripped of this, the resulting "bare bones" affidavit could not be saved by the subjective good faith of the government. *Id.* at 1346.

Applying *Weber*, the Ninth Circuit in *United States v. Underwood* affirmed the suppression of evidence seized from a defendant's home even though the supporting affidavit set forth "conclusory allegations" about how "drug traffickers often keep records from drug transactions at their residence." 725 F.3d 1076, 1083–84 (9th Cir. 2013). Because these generalized conclusions about drug traffickers were "foundationless as to [the defendant]" specifically, "they [could not] be used to support a finding of fair probability that drug trafficking evidence would be found at [the defendant]'s home." *Id.* at 1083. And because "[r]eliance upon a bare bones affidavit is never reasonable," the court found the good faith exception to be per se inapplicable. *Id.* at 1087.

The government fails to justify the basis of its search of A. Duong's home and car, and accordingly the Court should grant the instant motion to suppress without a hearing.

### 2.     Aspects of the Other Challenged Warrants Are Overbroad

In its opposition brief, the government disagrees that certain portions of the February and May 2024 warrants were overbroad. First, the government contends that its allegations regarding a specific bribery scheme involving the Duongs and CC1 provide probable cause to seize all communications between CWS employees and *any* state or local officials—regardless of topic or any connection to the alleged scheme. Opp. at 39. But when a warrant authorizes the seizure of categories "untethered from the crimes and individual being investigated," that constitutes overbreadth, requiring suppression.

3

*United States v. Monreal-Rodriguez*, 2022 WL 2442238, at \*7–8 (D. Ariz. Jan. 3, 2022), *R. & R. adopted*, 2022 WL 1957634 (D. Ariz. June 6, 2022).

For example, in *United States v. Washington*, in vacating the defendant's conviction, the Ninth Circuit held that evidence must be suppressed that was seized under a warrant based on allegations that the defendant was engaged in prostitution-related activity and that sought authorization to search for "evidence of association of [the defendant] with the following persons, *but not limited to them*." 797 F.2d 1461, 1473 (9th Cir. 1986) (emphasis in original). The court held that the warrant was "patently overbroad" because it permitted law enforcement to seize anything associating the defendant with any other person "regardless of any possible link to criminal activity." *Id.* The good faith exception was inapplicable because "in failing to particularize . . . the things to be seized," an officer could not "reasonably presume it to be valid." *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 899 (1984)). Additionally, in *Monreal-Rodriguez*, a firearms trafficking case, the court determined that a warrant authorizing the seizure of firearms, ammunitions, and related records was overbroad because it contained "a laundry list of firearms or records" unconnected from the crimes and individuals being investigated. 2022 WL 2442238, at \*7. The court found that the good faith exception did not apply because the warrant "was entirely lacking in particularity" with "no meaningful restrictions." *Id.* at \*14.

Second, the government argues that the warrants are not temporally overbroad. In support, it points to two events described in the affidavits but concededly not a part of the alleged scheme: (1) legislative action purportedly involving CWS that the Oakland City Council took in 2021 (while Sheng Thao was a councilmember but apparently not otherwise involved in the conduct herself), Dkt. 159 at 13–14; and (2) a defunct public ethics commission investigation dated between 2016 and 2018 that the government claims somehow shows a pre-existing "financial relationship" between A. Duong and Thao. Opp. at 37–38. However, even the affidavits set forth that the alleged bribery scheme did not begin until October 2022 and that Evolutionary Homes didn't even exist in or before 2021. Dkt. 120-1 ¶¶ 26, 35. More tellingly, the government is silent as to the contradictory fact that that the affidavits expressly stated that the "[publics ethics] investigation covers a different time period and conduct" than the alleged scheme here, and explicitly denied "relying on the PEC's investigation as the basis of

4

probable cause." Dkt. 139-11 ¶ 104 n.19; Mot. at 23.

The government's own cited case stands for the principle that "[t]here should be something in the affidavit that provides a fair probability" that defendants were engaging in the alleged criminal activity "during the date range requested by the warrant." *United States v. Lam*, 2020 WL 4349851, at *4 (N.D. Cal. July 29, 2020) (finding overbreadth where there was "no indication in the affidavit that could lead to an inference that defendants had engaged" in the alleged conduct for an eight-month period covered by the warrant).[2] The court in *United States v. Liang Chen* applied this rule when it suppressed evidence that was temporally overbroad in a case involving a defendant charged with crimes related to stealing trade secrets. 2020 WL 6585803, at *1, *8 (N.D. Cal. Nov. 10, 2020). The warrant in that case was found to have improperly authorized the seizure of materials for a period of time inclusive of when the defendant, as part of his employment duties, was authorized to work on a trade secrets licensing proposal. *Id.*

Because the February and May 2024 warrants were overbroad, and not executed in good faith, the Court should suppress the searches insofar as evidence was seized dating before December 2021, or that was unrelated to the state and local officials alleged in the affidavits to be purportedly involved in the specific scheme set forth.

## B. Alternatively, a *Franks* Hearing is Required as to the June 2024 Warrants

### 1. The Affiants' Omissions About Alleged Coordinated Attacks On CC1 Independently Justify A *Franks* Hearing

The government's opposition greatly narrows the issues the Court needs to consider to order a *Franks* hearing. That's because the government's opposition confirms that, despite having obvious reasons to doubt CC1's veracity, the affiants nonetheless presented the magistrate judges with only

---

[2] Nor does *Lam* support application of the good faith exception here, as that court only found that it was "not objectively unreasonable to rely" on an overbroad date range where the pre-probable cause conduct involved the defendants having "maintained robust and ongoing consulting relationships" directly with multiple companies, including the company to which the defendants allegedly provided trade secrets. 2020 WL 4349851, at *1. By contrast, the only allegation in the affidavits directly connecting A. Duong to Thao, prior to October 2022, is the conclusory and unexplained inference the government draws from the existence of a public ethics commission *investigation* ending in 2018, which did not result in any allegations against A. Duong—and so no finding whatsoever of a "financial relationship" with Thao—and which in any event the affidavits disclaim as providing probable cause for the searches. Dkt. 139-11 ¶ 104 n.19.

ANDY DUONG'S REPLY IN SUPPORT OF JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR *FRANKS* HEARING
CASE NO. 4:25-CR-00003-YGR

selective excerpts of CC1's manufactured claims of coordinated attacks—an assault and a shooting—against them by the Duongs. As presented to the magistrate judges, these supposed attacks were not just random but were apparently intended to intimidate CC1 and prevent them from cooperating with law enforcement in connection with the allegations of the underlying bribery scheme. Dkt. 120-1 ¶¶ 29, 120, 144.

**The Omissions Were Intentional and Reckless.** The first prong of *Franks*, requiring that the affidavit contained false statements or material omissions made with reckless disregard for the truth, is well satisfied here. Indeed, although the Motion explained that the June 2024 affidavits *intentionally* omitted nearly every major inconsistency across CC1's telling of what happened as to the May 3, 2024 incident—including that CC1 provided law enforcement contradictory accounts of who supposedly beat them up and what they supposedly took, Mot. at 11—the government does not address this in its opposition at all, thereby conceding the point. Similarly, as to the June 9, 2024 shooting, the government wholly ignores that the rollover affidavit alleged that a purported firearm found in A. Duong's home was associated with criminal activity, yet *intentionally* omitted that the *same database inquiry* utilized by the affiant produced a dozen additional results showing no criminal nexus. Mot. at 12; *see United States v. Allen*, 481 F. App'x 308, 309 (9th Cir. 2012) (granting *Franks* hearing where the affiants "knew but omitted from the affidavit various inconsistencies" in the informant's statements).

To the extent the government does address other omissions regarding the June 9, 2024 shooting, it doesn't dispute that information was in fact omitted—including conceding that multiple independent sources of evidence showed that "[CC1] shot first, rather than returning fire." Opp. at 20–21, in full contradiction of CC1's original account that the affiants adopted and included in their affidavits for the June 2024 warrants. The government argues, however, that it wasn't reckless to omit this contrary evidence because "[Special Agent] Haunold was not aware that [CC1] fired first until well after the *execution* of the June residential warrants [on June 20, 2024]." Opp. at 21 (emphasis added). That is wrong. CC1's son and neighbor both stated that they heard just four initial shots, and both affidavits reference the initial OPD report "logged" on June 9, 2024, that includes the son's statement. Dkt. 120-18 at 2, 5, Dkt. 120-1 ¶¶ 144–45, Dkt. 120-2 ¶ 23. The statement of CC1's neighbor, taken on June 10

6

and reported on June 11, 2024 by the affiants' own colleagues at the FBI, corroborates four initial shots. Dkt. 120-19 at 1, 4; *see United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992) ("[P]olice [can]not insulate one officer's deliberate misstatements merely by relaying it through an officer-affiant personally ignorant of its falsity.") (quoting *Franks v. Delaware*, 438 U.S. 154, 163–64 n.6 (1978)). The same OPD report confirmed that officers found *four* 40-caliber casings in CC1's front yard, corresponding to the type of ammunition CC1 admitted to using. Dkt. 120-18 at 2, 6. And ShotSpotter reports obtained by the FBI on June 15, 2024, also confirmed that just four initial shots were fired. *See* Dkt. 119 at 14–15; Opp. at 22; Haunold Decl. ¶ 26.

Even if the whole of the government lacked knowledge of these omissions (it did not), *Franks* does not sanction its willful ignorance. It explicitly covers misleading statements or omissions in an affidavit made "with reckless disregard for the truth." *Franks*, 438 U.S. at 155. Courts, including the Ninth Circuit, have found that an affiant has acted with reckless disregard for the truth when the affiant does not conduct a sufficient further inquiry resulting in a "failure . . . to discover" information undermining an affiant's statements made in a search warrant affidavit. *United States v. Chesher*, 678 F.2d 1353, 1361 (9th Cir. 1982); *see also United States v. Tanguay*, 787 F.3d 44 (1st Cir. 2015).

*Chesher* and *Tanguay* are both instructive here. In *Chesher*, the court found that the affiant "acted recklessly in failing to discover" a report from another investigative agency contradicting the affiant's primary allegation that Chesher was a member of the Hells Angels. 678 F.2d at 1361–62. The affiant failed to discover this information despite his extensive history investigating the Hells Angels and direct communications with the other investigative agency following the issuance of the relevant report. *Id.* at 1361. The court concluded that the circumstances surrounding the availability of countervailing evidence that the affiant failed to discover satisfied the substantial preliminary showing of recklessness *Franks* requires. *Id.* at 1362.

In *Tanguay*, the court likewise held that "red flag[s]" about an informant's credibility may trigger a "duty of further inquiry" into the informant and his claims, rejecting that a *Franks* violation "could not arise out of a failure to include in a warrant affidavit facts not actually known to the affiant." 787 F.3d at 52–53. There, the affiant "had some reason to doubt the veracity of her informant," Wiggin, because another officer explained Wiggin was "quirky," "troubled," and possibly mentally unstable.

7

*Id.* at 53. The affiant also knew about pieces of Wiggin's criminal background. *Id.* Because "[the affiant's] case for probable cause depended entirely on Wiggin's account," the court held that these "red flag[s]" were "sufficient to create a duty of further inquiry." *Id.* (citing *Chesher*, 678 F.2d at 1361–62); *see also United States v. Fox*, 790 F. Supp. 1487, 1494 (D. Nev. Mar. 24, 1992) ("failure to discover" information undermining an affiant's claim "reflected a reckless disregard for the truth," and the affiant "should have entertained sufficient doubt about the validity of the [claim]" and at least read the rest of the case file), *aff'd sub nom. United States v. Austin*, 8 F.3d 30 (9th Cir. 1993).

Here, the agents took steps to present selective pieces of the shooting allegations to the magistrate judges yet, at the same time, apparently chose not to review other parts of that investigative file that had the potential to be highly relevant. This is so even though the FBI had access to and began reviewing the OPD's investigation file even before submitting the June 14, 2024 original warrant application, and certainly before submitting the June 20, 2024 rollover warrant application, because both affidavits include information from that same file. *See* Dkt. 120-1 ¶¶ 144–45; Dkt. 120-2 ¶¶ 14, 23. This conscious avoidance is particularly troublesome given that the agents: (i) knew that CC1 was heavily incentivized to pin criminal blame on the Duongs; (ii) knew that CC1 had told wildly inconsistent stories about the May 3, 2024 alleged assault just a month prior; (iii) knew that CC1 had a lengthy rap sheet; (iv) knew that CC1 was connected to Mexican human traffickers; (v) knew from multiple independent sources that the June 9, 2024 shooting was very likely between CC1 and "Mexican" or "Hispanic" men; and (vi) had no evidence that the Duongs were aware of CC1's cooperation with the FBI. *See* Mot. at 11–12, 16, 21; Dkt. 120-1 ¶ 30 n.2.[3]

**Materiality.** The materiality prong of *Franks* is also met here. While the government does not address and therefore does not deny that the omitted May 3, 2024 allegations were material to probable cause, it does attempt to sidestep the fatal omissions regarding the June 9, 2024 shooting. *See* Opp. at 22 (noting that this is "not an attempted murder case"). But this does not save the warrants. Not only

---

[3] The government misplaces its reliance on *United States v. Miller*, 753 F.2d 1475 (9th Cir. 1985). As the court in *Tanguay* pointed out, *Miller* leaves the door open for "a duty of further inquiry." *Tanguay*, 787 F.3d at 51–54 & n.4. In *Miller*, the *Franks* challenge failed because the affiant "had no reason to doubt the truthfulness of the allegations that undergirded the showing of probable cause." *Id.* at 53 n.4 (citing *Miller*, 753 F.2d at 1478).

do the agents prominently feature the allegations regarding the alleged May 3, 2024 assault and the June 9, 2024 shooting in both June 2024 affidavits but, crucially, both affidavits allege probable cause that A. Duong violated 18 U.S.C. § 1512(a) by "kill[ing] or attempt[ing] to kill another person, with intent to []prevent the attendance or testimony of any person in an official proceeding." Dkt. 120-1 ¶¶ 2, 12; Dkt. 120-2 ¶ 3. Accordingly, the warrant applications requested authorization to seize items supposedly related to the purported attacks on CC1, making the affidavits' assertions regarding the alleged assaults necessary to any finding of probable cause.

Turning first to the rollover warrant: the allegations about the alleged attacks, and A. Duong's supposed involvement in them, proffered the sole basis for probable cause to seize almost every single item requested in the rollover warrant application. For instance, the government's only apparent asserted basis for seizing items identified as 9mm caliber firearms and ammunition and a firearm associated with Serial No. COP471US from A. Duongs home was its allegation that OPD officers "believe[d] the shooter involved in the June 9 shooting of [CC1] used a 9mm firearm." Dkt. 120-2 ¶ 14. And the only cited basis for seizing wearable accessories from A. Duong's garage was CC1's claim that they were assaulted and robbed of these items by individuals at the Duongs' direction on May 3, 2024. Dkt. 120-2 ¶ 16.

The original warrant affidavit likewise requested authorization to seize items that related solely to the alleged attacks. The only possible basis set forth in the June 14, 2024 warrant affidavit for seizing "[e]vidence, records or communications related to the [OPD]," ████████, or "attempts to intimidate, threaten or commit violence against individuals to prevent them from communicating information to law enforcement" necessarily rested on the set of allegations related to the May 3, 2024 and June 9, 2024 incidents. Dkt. 120-1 at Attachment B-2 ¶¶ 11–13; ¶¶ 29, 119–24, 126–27, 140, 144–45, 148; ¶¶ 121, 123; ¶¶ 30 n.2, 31, 120, 144.

Moreover, the timing of these warrant applications was no accident. The agents applied for a warrant to search A. Duong's home only after their very first interview with CC1 and the June 9, 2024 shooting, enabling them to manufacture a false sense of urgency for the government's broadest search warrants to date. Mot. at 16. Any reasonable magistrate judge would have taken extremely seriously allegations that suspects had ordered a hit on a cooperating witness, and those inflammatory allegations

9

could not have had any other effect but to lend a patina of credibility to CC1's underlying allegations of criminal activity, while masking the infirmities set forth in this motion.

### 2.      Other Reckless Omissions Underscore Materiality

The government agrees that the full context of CC1's sordid history of fraud, threats, and lies was not included in the affidavits, Opp. at 18, but contends that these omissions do not matter because (1) Special Agent Haunold was not aware of most of this information, (2) the omissions were insignificant, and (3) all the omissions combined, including those about the alleged shooting and assault, were not material to the finding of probable cause.  Addressed in turn below, all fail.

**1.**  The fact that Special Agent Haunold claims to have lacked actual knowledge about *some* of the omitted information does not change the analysis under *Franks*, as explained above.  As an initial matter, the government and Special Agent Haunold do not deny that he knew about a 2016 federal probe into CC1 for money laundering, a crime of financial deceit.  Mot. at 11; Opp. at 18; Haunold Decl. ¶ 19.  Although the government seeks to minimize the significance of that investigation, Special Agent Haunold documented his own belief, as of May 2023, that "[c]urrent transaction data" suggested CC1's "pattern" of financial deceit had "continued."  Dkt. 120-15 at 4.

Even if Special Agent Haunold didn't have actual knowledge of other omitted information, the government concedes that agents had "in fact entertained serious doubts as to the truth" of CC1's statements, noting among other things their knowledge of CC1's extensive rap sheet (including charges of grand theft and forgery, a crime of deceit), and their malign motivations for cooperating with the government.  *United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979); 120-1 ¶ 30 n.2.  These obvious red flags triggered the affiants' duty of further inquiry to conduct further investigation into CC1's past behavior in similar circumstances.  *Supra* at 7–8.  Had they done so, they would have discovered (and been compelled to include in the affidavits) critical information revealing CC1's *modus operandi* when backed into a corner by their fraud victims: to run to the courts or law enforcement and falsely point the finger elsewhere.

A. Duong does not assert, as the government suggests, that *Franks* required agents to "search and disclose all court records related to [CC1's] civil lawsuits."  Opp. at 18.  The problem with the affidavits—and the government's approach to this entire case—is that agents failed to search and

10

ANDY DUONG'S REPLY IN SUPPORT OF JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR *FRANKS* HEARING
CASE NO. 4:25-CR-00003-YGR

disclose *any* such records despite their "obvious" and admitted concerns about CC1's credibility. *See* Dkt. 120-1 ¶ 30 n.2. Astonishingly, this means that the agents did not even look into CC1's publicly available history of fraud at any time during their lengthy investigations of CC1 *even when they were the investigative target* (for fraud since February 2023, and as far back as 2016 for money laundering, Haunold Decl. ¶¶ 5, 18, 19). Such faulty investigation tactics call into question the government's reckless handling not just of the June 2024 warrants but the rush to judgment in this case as a whole.

Indeed, this also reflects the government's ongoing pattern of conscious avoidance as to CC1's credibility weaknesses, which began conspicuously as soon as CC1 sought to become a cooperating witness. Despite CC1's cooperation agreement requiring them to "provide all documents and other material asked for by the government," the parties' discovery correspondence indicates that the government has never bothered to physically collect from CC1—and thus preserve—any images of their phones, computers, or work files from their homes or offices. Declaration of Winston Y. Chan in Support of Andy Duong's Reply ("Chan Decl.") Ex. 2 at 8; Chan Decl. Ex. 1 at 2. This strategy of conscious avoidance continues to the present, manifest in the government's ongoing refusal to search for and provide requested impeachment-related discovery about CC1. For example, the government has refused to conduct a comprehensive search for and provide the defense with records relating to: (1) the government's historical investigations involving CC1 and list of investigative databases used in such a search; (2) bank and other financial accounts used by CC1; (3) communications and social media platforms used by CC1; or (4) CC1's immigration and travel records. Chan Decl. Ex. 1 at 2–3. These investigative shortfalls are all the more striking in light of the government's professed "corroboration" of CC1, Opp. at 25, and the government being on notice that CC1 has had post-plea external communications about this case with at least the media, Dkt. 139-10 at 3.

**2.** Next, the government mischaracterizes the substantial evidence of CC1's pattern of fraud, lies, and abusive legal claims in a failing effort to minimize the impact it would have had on the magistrate judges. It brushes aside many of these omissions as "decades-old civil complaints" without ever addressing CC1's specific pattern of fraud and judicial abuse that these documents convey. Opp. at 2, 17. As just one example, the government never addresses that CC1 was found to have defrauded the City of Oakland and A.C./L.T. in debt collection contracts, other than to say that the allegations

11

leading to these judgments are "over a decade old." Opp. at 17. For other omissions, it dismisses each relevant exhibit *individually* instead of reading them in concert as presented in D. Duong's motion for suppression and a *Franks* hearing ("D. Duong's Motion"), Dkt. 119. For example, D. Duong's Motion cites three separate exhibits to collectively tell the story of a successful fraud suit against CC1, during which CC1—in obvious echoes of this case—filed a frivolous police report against the plaintiffs for assault. *See* Dkt. 119 at 12 and Dkts. 120-5 (civil complaint against CC1), 120-6 (news report with more factual context about CC1's fraud and legal abuse), and 120-7 (judgment against CC1 in that case). Presenting each exhibit in isolation, the government misleadingly implies no connection between the three documents. *See* Opp. at 17. And instead of grappling with the cumulative effect of certain exhibits (Dkts. 120-16, 120-17) showing that CC1 was *forced* to give up their real estate license for defrauding the parties to a real estate transaction, the government presents only one exhibit in isolation as "an order wherein [CC1] *voluntarily agreed to surrender [their] real estate license*." Opp. at 17 (emphasis added).

**3.** Finally, the government is wrong that on top of the omissions regarding the alleged attacks addressed in *supra* section II.B.1, this omitted information would not have altered the magistrate judges' finding of probable cause. The government argues that the affidavits contained "significant disclosures" about CC1 that "were more than sufficient for the magistrate judge to have understood Co-Conspirator 1 had potentially serious credibility issues." Opp. at 15, 25. But these so-called "significant disclosures," which the government concedes were cabined to a single footnote, did not provide the full picture about CC1's deep credibility defects because they merely opined that CC1 appeared to have been "motivated by revenge" and other "potential personal motivations" to cooperate, and recited certain parts of CC1's criminal history. *Id.* at 15; Dkt. 120-1 ¶ 30 n.2. These disclosures barely break the surface of CC1's lack of credibility. Disclosing CC1's pattern of fraudulent behavior, and in particular CC1's past instances of accusing business partners of crimes, would have given any magistrate pause to consider whether CC1's statements, as adopted by the affiants, reflected the same pattern of behavior: making accusations against the Duongs when CC1's schemes began to crumble.

Contrary to the government's assertions, CC1's statements should be wholly disregarded in determining materiality. The government asserts that their statements still have value in part because

ANDY DUONG'S REPLY IN SUPPORT OF JOINDER AND ADDITIONAL MOTION TO SUPPRESS AND FOR *FRANKS* HEARING
CASE NO. 4:25-CR-00003-YGR

CC1's statements are "corroborated throughout" by other documentary evidence. Opp at 25. But the corroborating evidence the government claims lends credibility to CC1's statements is on immaterial aspects of the investigation and does not concern anything that supports the existence of the actual alleged scheme (*e.g.*, confirmation of CC1's work on a negative mailer campaign, Mot. at 4, call logs showing calls were made but not corroborating the content of those calls, Mot. at 6, 16). *See, e.g.*, *United States v. Hall*, 113 F.3d 157, 159 (9th Cir. 1997) ("corroboration of innocent facts" did not adequately corroborate a tip from the informant, "a known liar").

As the Motion explains, after properly disregarding CC1's statements, the leftover documentary evidence is insufficient to support probable cause. Mot. at 12–19. In response, the government cites only two examples of documentary evidence involving A. Duong that it claims do not rely on CC1's statements: (1) messages between CC1 and A. Duong "where they expressed frustration that Jones was calling David Duong to get 'direct access' to the '$$,'" Opp. at 27; and (2) A. Duong's vague response that "David knows already" to CC1's texts that supposedly "detailed the bribery scheme." *Id*. Nothing about these messages in a vacuum establishes probable cause of a bribery scheme. The first becomes inculpatory only if one accepts CC1's narrative that it has anything to do with a bribe. The second is one in a convoluted stream of messages initiated by CC1 regarding a cryptic note drafted by CC1. Once CC1's statements about the meaning of their own statements are discounted, all that remains to support the allegations of what A. Duong meant when he responded to CC1's nonsense is the affiant's interpretation of the message, which is not enough to establish probable cause when devoid of "foundational facts." *United States v. Cervantes*, 703 F.3d 1135, 1139 (9th Cir. 2012).

The government asserts this case is like *United States v. Meling*, where the Ninth Circuit held that there was significant evidence to support a finding of probable cause even after excluding the informant's statements. 47 F.3d 1546, 1555 (9th Cir. 1995); Opp. at 24–25. In *Meling*, the Ninth Circuit found that the informant's statements should not be entirely discredited, despite the government omitting information such as his past convictions for crimes of dishonesty and an interest in winning reward money in exchange for testifying, because there was "considerable independent evidence" corroborating that the defendant poisoned his wife, including that the defendant had obtained $700,000 in life insurance on his wife before she was poisoned, mentioned the possibility of cyanide poisoning

13

to the doctors treating his wife, suggested his wife not cooperate with the prosecutor, and shared his escape plan to Canada with his family. 47 F.3d 1546 at 1551–52, 1554–55. No such "considerable independent evidence" was contained in the June 2024 affidavits. *Id.* at 1555.

Furthermore, the government is wrong that this case is not like *Hall*. Opp. at 28–29. In *Hall*, the government made the precise argument that the government makes here and even analogized to *Meling*. *See Hall*, 113 F.3d at 160. But the Ninth Circuit rejected that argument because, after discounting the informant's credibility, the only *corroborated* facts were that the defendant drove a red and white pickup truck registered in his name, pulled into a particular parking space in a trailer park that the informant had indicated the defendant lived at, and lived in Anchorage, Alaska. *Id*. at 157, 159–60. The court found this insufficient for a magistrate judge to find that probable cause existed to search the defendant's trailer for evidence of dealing narcotics since countless innocent people would fit that description. *Id.* at 159. Devoid of CC1's interpretive gloss of the cited documents—and without the false backdrop of urgent danger to CC1—the June 2024 affidavits lose all their inculpatory texture.

In a last-ditch attempt to salvage the June 2024 warrants, the government asserts that even if CC1's statements are completely thrown out, the Court need not analyze whether any leftover evidence establishes probable cause because the FBI obtained prior warrants to obtain information directly from online phone and email accounts based solely on the documentary evidence, which the defendants have not moved to suppress. Opp at 26. But A. Duong's decision thus far to not challenge the probable cause underlying those prior warrants is not an endorsement of those warrants' probable cause showing. And as demonstrated above, the circumstances of those prior warrants do not change the fact that the government sought a much more intrusive warrant in June 2024—a warrant to search A. Duong's personal residence and car—and only after it could utilize CC1's baseless accusations, including about a supposed attempt on their life. *Supra* at 10. This was no coincidence, and regardless, the only thing that matters is what information was before, or else concealed from, the magistrate judges with respect to the challenged warrants. The government cannot backtrack now by pretending it never made beneficial use of the information that tainted the magistrate judges' evaluation of probable cause for the June 2024 warrants.

14

## III.     CONCLUSION

For the foregoing reasons, A. Duong respectfully requests that the Court grant this Motion to suppress all evidence obtained pursuant to the June 2024 warrants, including from the room of D. Duong's house that the government alleges is attributable to A. Duong, and suppress certain evidence seized pursuant to the February and May 2024 warrants.  In the alternative, A. Duong respectfully requests that the Court hold a *Franks* hearing to determine whether suppression of the evidence obtained pursuant to the June 2024 warrants is warranted.[4]

DATED: January 29, 2026                              Respectfully submitted,

By: */s/ Winston Y. Chan*
      Winston Y. Chan
      Hannah Erin Stone
      GIBSON, DUNN & CRUTCHER LLP

      W. Douglas Sprague
      COVINGTON & BURLING LLP

      Erik Babcock
      LAW OFFICES OF ERIK BABCOCK

      Attorneys for Defendant Andy Hung Duong

---

[4] A. Duong previously joined in the part of D. Duong's Motion relating to certain categories of subscriber information obtained under the March 22, 2024 warrant, as applied to A. Duong.  Mot. at 22.  A. Duong now joins in D. Duong's concession in his reply brief that suppression is not an available remedy as to that part of the challenge to that warrant.

15